[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14378
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cr-20508-CMA-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

OSCAR GUARDARRAMA-SUAREZ,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 19, 2019)

Before JORDAN, JILL PRYOR and TJOFLAT, Circuit Judges.

PER CURIAM:

Oscar Guardarrama-Suarez appeals his sentence of 92 months' imprisonment, which was imposed after he pled guilty to one count of conspiracy to commit health care and wire fraud. Guardarrama-Suarez argues that the district court erred in calculating his offense level under the Sentencing Guidelines by applying a two-level enhancement for using sophisticated means and a four-level enhancement for playing an aggravating role. We conclude that the district court did not err in applying either enhancement and affirm Guardarrama-Suarez's sentence.

## I.    BACKGROUND

Guardarrama-Suarez pled guilty, pursuant to a written plea agreement, to one count of conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349. As the owner and operator of Antares Pharmacy ("Antares"), Guardarrama-Suarez paid patient recruiters—including Noemi Delgado, Daris Hernandez, and someone known only as "J.M."—to refer fraudulent prescriptions to Antares.[1] Guardarrama-Suarez and others then submitted, or caused the submission of, claims to the Medicare Part D prescription program for drugs that were never dispensed to the Medicare beneficiaries. In fact, Antares never purchased many of the drugs to begin with and therefore never had the drugs to dispense. As a result of the scheme, the Part D program paid Antares $1,722,080

---

[1] These facts are based on the parties' proffer agreement.

2

for drugs that were never dispensed.  From these proceeds, Guardarrama-Suarez paid himself $315,000, a company his wife owned approximately $200,000, and a company his brother owned approximately $600,000.

A grand jury indicted Guardarrama-Suarez for several crimes, including one count of conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349.  Guardarrama-Suarez agreed to plead guilty to the conspiracy charge.  In the plea agreement, the parties agreed that for purposes of sentencing, Guardarrama-Suarez's base offense level under the Sentencing Guidelines was seven and that a sixteen-level enhancement applied based on an actual loss to Medicare exceeding $1,500,000 but not exceeding $3,500,000.  The plea agreement also stated that the parties remained free to argue for or against any other enhancement or adjustment at sentencing.

Before sentencing, the probation office prepared a pre-sentence investigation report ("PSI").  Consistent with the plea agreement, the PSI assigned a base offense level of seven and a sixteen-level enhancement based on the loss amount.  In addition, the PSI applied a two-level enhancement because the offense involved a government health program and the loss amount was more than $1,000,000 but not more than $7,000,000, *see* U.S.S.G. § 2B1.1(b)(7)(A), (B)(i); a two-level enhancement because the offense involved sophisticated means, *see id.* § 2B1.1(b)(10)(C); and a four-level aggravating role enhancement because

3

Guardarrama-Suarez was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, *see id.* § 3B1.1(a). After applying a three-level reduction for acceptance of responsibility, the PSI calculated the total offense level as 28.

Guardarrama-Suarez objected to the enhancement for sophisticated means, arguing that his case was a garden-variety fraud cause. He also objected to the enhancement for being an organizer or leader because he did not manage or supervise the patient recruiters and the government failed to identify the requisite number of participants in the scheme.

In response, the government argued that the sophisticated means enhancement was appropriate because Guardarrama-Suarez used cash kickbacks to conceal the fraudulent scheme and because his brother's company was in fact a shell company through which he laundered illegal proceeds. The government also argued that the enhancement for organizing or leading the scheme was appropriate because Guardarrama-Suarez incorporated, owned, and opened Antares; created and submitted claims for fraudulent prescriptions without even ordering many of the drugs; was a signatory for and controlled Antares' bank accounts; paid the patient recruiters; and received the largest share of the proceeds of the fraud. The scheme involved five or more participants—Guardarrama-Suarez, Delgado, Hernandez, and two employees. Even if five participants were not involved, the

4

scheme was "otherwise extensive," U.S.S.G. § 3B1.1(a), because it lasted for over four years, involved at least $1.7 million in actual losses, and was concealed through cash kickbacks and a shell company.

At the sentencing hearing, Guardarrama-Suarez objected to both enhancements. He objected for the first time to the statement in the PSI that his brother's company was a shell company. He argued that he laundered no money through his brother's company and that he was repaying his brother for a loan to buy the pharmacy. The district court overruled Guardarrama-Suarez's objections and applied a two-level sophisticated means enhancement and a four-level aggravating role enhancement based on the PSI, the government's responses to Guardarrama-Suarez's objections to the PSI, and the government's arguments in court. Based on a total offense level of 28 and criminal history category of I, the district court calculated Guardarrama-Suarez's guidelines range at 78 to 97 months' imprisonment. The district court imposed a sentence of 92 months' imprisonment. This appeal followed.

## II.    STANDARD OF REVIEW

With respect to the Sentencing Guidelines, we review "purely legal questions *de novo*, a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference." *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1136-37 (11th Cir.

2004) (internal quotation marks omitted).  "Review for clear error is deferential and we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed."  *Id.* at 1167 (alterations adopted) (internal quotation marks omitted) (citations omitted).  A district court's choice between two permissible views of the evidence cannot be clear error. *United States v. Ndiaye*, 434 F.3d 1270, 1305 (11th Cir. 2006).

## III.   DISCUSSION

The issues on appeal are whether the district court erred in applying the sophisticated means enhancement and the aggravating role enhancement.  After careful review, we conclude that the district court did not err in applying either enhancement.

**A.    The District Court Did Not Err in Enhancing Guardarrama-Suarez's Sentence for Intentionally Engaging in or Causing Conduct Constituting Sophisticated Means.**

In calculating Guardarrama-Suarez's offense level, the district court applied a two-level enhancement for using sophisticated means to accomplish his crime under U.S.S.G. § 2B1.1(b).  On appeal, Guardarrama-Suarez challenges the application of the enhancement, arguing that the government failed to present evidence other than its own assertions at the sentencing hearing that he

intentionally engaged in conduct constituting sophisticated means.[2]  The government argued that it need not present any additional evidence during the sentencing hearing because the facts supporting the enhancement were either admitted in the factual proffer or undisputed in the PSI.  We affirm the district court's application of the two-level sophisticated means enhancement.

The Sentencing Guidelines provide for a two-level enhancement if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(c).  "Sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  *Id.* cmt. n.9(B).  "[H]iding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" ordinarily constitutes sophisticated means.  *Id.*  When evaluating whether a defendant qualifies for the enhancement, the district court must focus on the offense conduct as a whole because "[t]here is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement.  Rather, it is sufficient if the totality of the scheme was sophisticated."  *United States v.*

---

[2] The plea agreement included a sentence appeal waiver.  Guardarrama-Suarez argues that the waiver was not knowing and voluntary and that enforcement of the waiver would result in a miscarriage of justice.  The government has chosen not to rely on the appeal waiver, however, because there is an inconsistency between the language of the appeal waiver and the district court's explanation of the appeal waiver during the plea colloquy.

*Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).

Guardarrama-Suarez does not dispute that, over the course of more than four years, he created and billed Medicare for fraudulent prescriptions, paid proceeds to patient recruiters in cash, and diverted proceeds to his wife's and brother's companies. He contests on appeal, however, the district court's factual finding that his brother's company, MIG-3, was a shell company through which he laundered proceeds of the fraud scheme. But the district court "may accept any undisputed portion of the presentence report as a finding of fact." DE 98 at 7-8; Fed. R. Crim. P. 32(i)(3)(A).[3] And Guardarrama-Suarez failed to timely object to the statement in the PSI that MIG-3 was a shell company through which he laundered the proceeds of the fraud scheme.

At sentencing, Guardarrama-Suarez raised for the first time an argument that payments to his brother were legitimate because he was repaying money his brother had loaned him for the pharmacy. Although a district court has discretion to allow a party to make a new objection to the PSI any time before the sentence is imposed if good cause is shown, Guardarrama-Suarez did not attempt to show good cause at sentencing for his new objection to the PSI's characterization of MIG-3 as a shell company. Fed. R. Crim. P. 32(i)(1)(D). Thus, the district court did not clearly err in finding that Guardarrama-Suarez diverted proceeds through

---

[3] All citations in the form "DE __" refer to the district court's docket entries.

8

MIG-3.

We affirm the district court's application of the sophisticated means enhancement because Guardarrama-Suarez's scheme—which involved the creation of false prescriptions for drugs never purchased or dispensed and billing Medicare for them—lasted for an extended period of time, and he used cash kickbacks and a shell company to conceal it. This Court has "repeatedly endorsed" the consideration of length of a scheme in determining whether the sophisticated means enhancement applies. *United States v. Feaster*, 798 F.3d 1374, 1380 (11th Cir. 2015) (holding that fraudulent activity carried out over a two-year period supported application of the enhancement).[4] Guardarrama-Suarez argues that the payment of patient recruiters and patients with cash kickbacks is not sophisticated because healthcare fraud cases often involve cash kickbacks. This Court has recognized, however, that cash kickbacks can constitute a form of concealment that reflect the sophistication of a scheme, and we conclude that they do so here. *See, e.g.*, *United States v. Elbeblawy*, 899 F.3d 925, 939 (11th Cir. 2018) (affirming the application of the sophistication enhancement where the defendant admitted to using cash to pay doctors to conceal healthcare fraud and other factors supported the enhancement). Furthermore, the commentary to § 2B1.1(b)(10)(c) explicitly

---

[4] Guardarrama-Suarez argues that the length of a scheme alone does not warrant applying the sophisticated means enhancement. We need not address this argument because the enhancement here was applied based on other factors, including the use of cash kickbacks and a shell company.

9

identifies the use of a shell company to hide assets or transactions as conduct that warrants the application of the enhancement.  § 2B1.1(b)(10)(c) cmt. n.9(B).

## B.    The District Court Did Not Err In Enhancing Guardarrama-Suarez's Sentence For Organizing or Leading the Conspiracy.

The district court applied a four-level enhancement because Guardarrama-Suarez was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  U.S.S.G. § 3B1.1(a).  Guardarrama-Suarez challenges the district court's finding that he was the leader or organizer of the scheme and argues that there is no evidence that he exerted control over another participant in the scheme.[5]  We conclude that the district court did not clearly err in applying this enhancement.

A court may apply a four-level enhancement if the defendant (1) was an organizer or leader of a criminal activity that (2) involved five or more participants or was otherwise extensive.  U.S.S.G. § 3B1.1(a).  "The government bears the burden of proving by a preponderance of the evidence that the defendant had an aggravating role in the offense."  *United States v. Yeager*, 331 F.3d 1216, 1226 (11th Cir. 2003).

In distinguishing a leadership and organizational role from one of mere management or supervision, the court considers factors such as:  (1) exercise of

---

[5] Guardarrama-Suarez does not argue on appeal, as he did in district court, that the scheme did not include five or more participants or was otherwise not extensive.

10

decision-making authority, (2) nature of participation in the commission of the offense, (3) recruitment of accomplices, (4) claimed right to a larger share of the fruits of the crime, (5) degree of participation in planning or organizing the offense, (6) nature and scope of the illegal activity, and (7) degree of control and authority exercised over others.  U.S.S.G. § 3B1.1, cmt. n.4.  "Because the district court must interpret the factors stated in the commentary, and must exercise its best judgment as to the application of the facts to these standards, its decision is entitled to one of deference on appeal."  *United States v. Vallejo*, 297 F.3d 1154, 1169 (11th Cir. 2002) (internal quotation marks omitted).

Although the enhancement does not require evidence of all the factors, *United States v. Dixon*, 901 F.3d 1322, 1348 (11th Cir. 2018), "there must be evidence that the defendant exerted some control, influence or decision-making authority *over another participant in the criminal activity*."  *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) (emphasis added);  *see* U.S.S.G. § 3B1.1 cmt. n.2 (requiring that the defendant have been the organizer or leader "of one or more other participants").  "[A] section 3B1.1 enhancement cannot be based *solely* on a finding that a defendant managed the assets of a conspiracy."  *United States v. Glover*, 179 F.3d 1300, 1303 (11th Cir. 1999) (emphasis added) (holding that control over cocaine, an asset of the conspiracy, did not show that the defendant exercised control over another participant); *cf. Vallejo,* 297 F.3d at 1169

(concluding that evidence that the defendant gave orders to co-conspirators supported the district court's application of the § 3B1.1 enhancement). Control over assets is not the same as control over people. The commentary notes to the enhancement clarify that for a defendant who "did not organize, lead, manage, or supervise another participant, but who nevertheless exercise[d] management responsibility over the property, assets, or activities of a criminal organization," an upward departure may be warranted, but this enhancement would not be appropriate. U.S.S.G. § 3B1.1 cmt. n.2.

The district court did not clearly err in finding that Guardarrama-Suarez led or organized the scheme. First, he exercised decision-making authority and played a significant role in planning and organizing the offense. *See United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018). The parties do not dispute that Guardarrama-Suarez was the owner, officer, incorporator, registered agent, and operator of Antares; he enrolled Antares in the Medicare Part D drug program; he was the signatory and exercised control over the pharmacy's bank accounts; and he recruited and paid patient recruiters who were co-conspirators.

Second, Guardarrama-Suarez profited most from the scheme. *Shabazz*, 887 F.3d at 1222. He received not only the $315,000 he paid himself, but also the $600,000 he laundered through his brother's company. Thus, Guardarrama-Suarez gained $915,000, a majority of the fruits of the crime, which totaled $1.7 million in

12

actual losses.[6]

Third, Guardarrama-Suarez exerted control over other participants in the crime. He recruited and paid patient recruiters who he admitted were co-conspirators. *See Ndiaye*, 434 F.3d at 1304 (concluding that the district court did not clearly err by finding that the defendant was an organizer or leader in part because the defendant recruited co-conspirators). Additionally, he exerted control over patient recruiter Hernandez by negotiating the percentage of the kickbacks Hernandez would be paid. The PSI states that Hernandez referred Medicare beneficiaries to multiple pharmacies that defrauded Medicare Part D. Guardarrama-Suarez "reached an agreement with Hernandez [] to be paid 20% to 30% of what was billed to Medicare for bringing beneficiaries to Antares." PSI at 8. Guardarrama-Suarez did not object to these facts. The fact that Guardarrama-Suarez negotiated an agreement with Hernandez does not alone indicate that he exerted control over him. Given that Guardarrama-Suarez also profited most from the scheme and negotiated what amount of kickbacks Hernandez received, however, we find it more likely than not that he had the upper hand in these negotiations. *See Yeager*, 331 F.3d at 1226. We cannot say that the district court's finding that Guardarrama-Suarez led or organized the scheme was clearly

---

[6] As for the $200,000 Guardarrama-Suarez paid his wife's company, the government did not present reliable and specific evidence that this company was a shell company. *See Martinez*, 584 F.3d at 1026. Regardless, Guardarrama-Suarez claimed the largest share of the illegal proceeds.

13

erroneous.  Thus, the district court did not err in applying the enhancement.

## IV.    CONCLUSION

For the foregoing reasons, we affirm Guardarrama-Suarez's sentence.

**AFFIRMED.**

14